Receipt number AUSFCC-10775615

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| SCHALA BATTLE *et. al*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. **25-1651 C** |
| ) | |
| THE UNITED STATES OF AMERICA ) | DATE: October 3, 2025 |
| ) | |
| Defendant. ) | |

**COMPLAINT**

Plaintiffs, a group of so-called personal service contractors ("PSC") employed by the United States Agency for International Development ("USAID" or the "Agency"), are parties to a contractual structure that impermissibly constrains their constitutional rights under the First Amendment against political removals. The contracts are structured to impose on the workers— who the federal government openly identifies as federal employees—all the burdens associated with run-of-the-mill federal employment but deny them fundamental, distinct, and historically-recognized benefits of federal employment. USAID has deployed and maintained this structure for employing its "personal service contractor" workforce for one reason and one reason only: it allows the Agency to have its cake and eat it too. USAID mainly achieves this unequal and unlawful bargain by deploying the Contract Disputes Act ("CDA") as a source of dispute-resolution in the contract. But both the plain language of the CDA and the legislation that authorizes hiring of USAID personal service contractors as federal employees prevent the Federal Government from subjecting its own federal employees to CDA's dispute mechanism. Instead, when contracted federal employees' historically recognized rights and entitlements, including their constitutional rights, are constrained or breached, those employees can seek direct redress in this Court which has jurisdiction over both breach of contract claims against the United States and

money-mandating claims arising under the Constitution. In such cases Congress has authorized the Court to order money damages and direct restoration to office or position, placement in appropriate duty or retirement status, and correct applicable records. Plaintiffs bring this case to seek that remedy, including an order directing restoration to their positions and to recover from the United States any and all remedies available in traditional breach of contract cases against the United States government, including compensatory and consequential money damages, back pay, interest, attorney fees, and any and all costs that Plaintiffs are owed because of the Agency's breach of contract in terminating them without cause and in violation of the Administrative Procedure Act (APA) and the federal employees' First Amendment's right against patronage-based employment decisions.

**INTRODUCTION**

1. The Federal Government is required to obtain its employees by direct hire and after appointing them to civil or foreign service, which in turn subjects those employees to both requirements and the entitlements prescribed under the applicable civil service or foreign service laws and regulations.

2. The Federal Government can only use alternative hiring mechanisms to the extent Congress has specifically authorized it.

3. The Foreign Assistance Act of 1961 charges the Executive Branch agencies, including USAID, with the responsibility to promote economic development and strengthen democratic institutions abroad through foreign aid. Foreign Assistance Act of 1961("FAA"), Pub. L. No. 87-195, 75 Stat. 424, 424, 22 U.S.C. § 2151.

4.      Since its establishment in 1961, USAID employees have carried out the statutory mandates of the FAA and other program-specific mandates imposed by Congress under the stewardship of eleven different presidential administrations.

5.      USAID programs throughout the years have supported the United States' political and strategic interests across the world, including by providing assistance to countries in conflict, whether that conflict is spurred on by poverty, disease, economic or political crises, or other humanitarian needs.

6.      To carry out this mission, USAID has for decades deployed the services of personal service contractors.

7.      In February of 2025, USAID terminated its personal service contracts en masse, in an unprecedented move.

8.      Contemporaneous statements by officials in charge of such decisions indicate that personal service contracts were terminated abruptly and without cause because the administration could not trust the political affiliation of these federal employees and viewed their work as indirect financial support for the Democratic Party.

9.      Public employees have a First Amendment constitutional right that protects them from being fired because of their political affiliation. *Elrod v. Burns*, 427 U.S. 347 (1976); *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 79 (1990).

10.     Plaintiffs bring this action to vindicate their right that: 1) as federal employees they are not subject to the Contract Dispute Act and can therefore seek direct judicial review without administrative exhaustion; 2) that the government cannot exercise its broad Federal Acquisition Regulation (FAR) -based termination for convenience authority to terminate its own employees when the decision violated the employees' constitutional rights; 3) that termination of their

3

employment based on political patronage did in fact violate well-established First Amendment protections against compelling political beliefs and associations of public employees, constituted a breach of contract, and violated the Administrative Procedure Act by ignoring the personnel regulations that governed their employment; and 4) that these violations entitle Plaintiffs to money damages and all equitable remedies that are incidental and collateral to that remedy. Plaintiffs therefore claim that they are entitled to all remedies, including compensatory monetary damages and restoration to their positions associated with violation of this specific First Amendment right and any and all remedies available in traditional breach of contract cases against the United States government.

## JURISDICTION

11.    The United States Court of Federal Claims has jurisdiction over Plaintiffs' First Amendment claims under the Tucker Act which gives the Court jurisdiction to "render judgment upon any claim against the United States founded [] upon the Constitution..." § 1491.

12.    The First Amendment serves as a money-mandating source of substantive law in special cases when the underlying claim is tied to violation of legislation or regulation that can fairly be interpreted as contemplating money damages. *Tanzin v. Tanvir*, 592 U.S. 43, 51 (2020) (finding that for some First Amendment violations money damages are the only form of appropriate relief).

13.    The Court also has jurisdiction over the claims under 28 U.S.C. § 1491(a)(1) which authorizes the Court to render judgment on any claims against the United States founded upon "any express or implied contract with the United States."

14.    The permissive joinder of the Plaintiffs in this action is appropriate pursuant to Fed. R. Civ. P. Rule 20(a)(1) because the Plaintiffs have asserted rights to relief jointly, severally,

4

or in the alternative, with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and, because questions of law or fact which will arise in this action are common to all Plaintiffs.

## VENUE

15.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) and (e)(1) because this action seeks relief against the United States and a substantial part of the events giving rise to the claims occurred within this venue. Venue is also proper pursuant to 28 U.S.C. § 1402.

## THE PARTIES

16.     The Defendant is the United States of America ("Government") acting by and through the USAID, the Department of State, and other agencies. At all material times, the Defendant has employed the Plaintiffs as federal employees through contracts and has had its principal place of business in Washington, D.C.

17.     All Plaintiffs have been employed by Defendant as Personal Service Contractors at USAID during which time the Defendant classified them as federal employees in their contracts.

18.     Plaintiff Warren Acuncius signed a PSC contract with USAID on August 9, 2022, to serve as Military Liaison Team Unit Lead in USAID's Bureau for Humanitarian Assistance (BHA). USAID terminated the contract on February 19, 2025.

19.     Plaintiff Scott Alexander signed a PSC contract with USAID on August 28, 2022, to serve as Support Relief Group, Response Resources Specialist in BHA. USAID terminated the contract on February 21, 2025.

20.     Plaintiff Troy Baker signed a PSC contract with USAID on October 10, 2024, to serve as Infectious Disease and Pandemics Coordinator in BHA. USAID terminated the contract on February 19, 2025.

5

21.    Plaintiff Jeffrey Daniel Bakken signed a PSC contract with USAID on May 11, 2023, to serve as Response Operations Center Manager in BHA. USAID terminated the contract on February 18, 2025.

22.    Plaintiff Schala Battle signed a PSC contract with USAID on September 21, 2023, to serve as Strategic Planning and Activity Design Advisor in BHA. USAID terminated the contract on February 12, 2025.

23.    Plaintiff Ian Bennett signed a PSC contract with USAID on November 13, 2024, to serve as Support Relief Group Generalist in BHA. USAID terminated the contract on February 19, 2025.

24.    Plaintiff Alix Cho signed a PSC contract with USAID on April 16, 2024, to serve as Knowledge Management and Organizational Learning (KMOL) Advisor in USAID Bureau for Democracy, Human Rights and Governance (DRG). USAID terminated the contract on February 19, 2025.

25.    Plaintiff Anne Meredith Dalton signed a PSC contract with USAID on April 12, 2023, to serve as Support Relief Group, Field Operations Advisor and Senior Advisor in BHA. USAID terminated the contract on February 21, 2025.

26.    Plaintiff Andrew Dusek signed a PSC contract with USAID on December 19, 2021, to serve as Press and Public Outreach Officer in BHA. USAID terminated the contract on February 19, 2025.

27.    Plaintiff Allison Eriksen signed a PSC contract with USAID on November 25, 2024, to serve as Senior Humanitarian Assistance Officer in BHA. USAID terminated the contract on February 19, 2025.

6

28.     Plaintiff Frances Fierst signed a PSC contract with USAID on November 13, 2020, to serve as Support Relief Group Generalist in BHA. USAID terminated the contract on February 20, 2025.

29.     Plaintiff Jusuf Fuduli signed a PSC contract with USAID on March 27, 2020, to serve as Support Relief Group, Administrative Specialist in the Office of US Foreign Disaster Assistance. USAID terminated the contract on February 20, 2025.

30.     Plaintiff Michelle Gamber signed a PSC contract with USAID on September 16, 2023, to serve as Support Relief Group, Generalist in BHA. USAID terminated the contract on February 19, 2025.

31.     Plaintiff Julie Grundberg signed a PSC contract with USAID on September 12, 2022, to serve as Deputy Manager for Operations/Deputy Team Leader for Operations in BHA. USAID terminated the contract on February 19, 2025.

32.     Plaintiff Brittany Heyer signed a PSC contract with USAID on July 23, 2024, to serve as Support Relief Group Generalist in BHA. USAID terminated the contract on February 21, 2025.

33.     Plaintiff Julia Holladay signed a PSC contract with USAID on August 22, 2023, to serve as Humanitarian Assistance Officer in BHA. USAID terminated the contract on February 19, 2025.

34.     Plaintiff Anna Kuznetsova signed a PSC contract with USAID on December 20, 2024, to serve as Evidence and Learning Program Specialist in DRG. USAID terminated the contract on February 6, 2025.

35.    Plaintiff Dianna Long signed a PSC contract with USAID on February 21, 2024, to serve as U.S. Mission to United Nations in New York (USUN) Humanitarian Advisor in BHA. USAID terminated the contract on February 19, 2025.

36.    Plaintiff Thomas McNelly signed a PSC contract with USAID on September 15, 2023, to serve as Support Relief Group Generalist in BHA. USAID terminated the contract on February 21, 2025.

37.    Plaintiff Darren Milosevich signed a PSC contract with USAID on May 22, 2023, to serve as Support Relief Group Generalist in BHA. USAID terminated the contract on February 21, 2025.

38.    Plaintiff Kodé Nascimento signed a PSC contract with USAID on February 23, 2023, to serve as Humanitarian Capacity Advisor in BHA. USAID terminated the contract on February 19, 2025.

39.    Plaintiff Laura Neff signed a PSC contract with USAID on July 18, 2024, to serve as Support Relief Group Generalist in BHA. USAID terminated the contract on February 20, 2025.

40.    Plaintiff Amanda Nieman signed a PSC contract with USAID on December 12, 2021, to serve as Support Relief Group Generalist in BHA. USAID terminated the contract on February 21, 2025.

41.    Plaintiff Christina Parodi signed a PSC contract with USAID on June 11, 2024, to serve as Support Relief Group Generalist in BHA. USAID terminated the contract on February 18, 2025.

42.    Plaintiff Catherine Perkins signed a PSC contract with USAID on March 7, 2022, to serve as Support Relief Group Generalist in BHA. USAID terminated the contract on February 21, 2025.

8

43.    Plaintiff Brittany Pouliot signed a PSC contract with USAID on November 13, 2024, to serve as Humanitarian Assistance Officer in BHA. USAID terminated the contract on February 19, 2025.

44.    Plaintiff Shivani Ray signed a PSC contract with USAID on June 1, 2023, to serve as Field Operations Advisor/Senior Advisor in BHA. USAID terminated the contract on February 19, 2025.

45.    Plaintiff Kelsie Wring signed a PSC contract with USAID on August 7, 2023, to serve as Field Operations Desk Officer in BHA. USAID terminated the contract on February 19, 2025.

## ALLEGATIONS COMMON TO ALL CLAIMS

### A.    *Plaintiffs' Employment Arrangement*

46.    Defendant and its officers and agencies are responsible under the United States Constitution, federal law, and regulations for the establishment and administration of personnel, employment, and compensation policies and practices.

47.    Defendant and its officers and agencies are responsible for applying to Plaintiffs the legal provisions and any applicable federal pay and compensation statutes and regulations that define Plaintiffs' entitlements.

48.    Defendant relied on the authority of Section 636(a)(3) of the FAA, as amended, and other program-specific congressional grants of authority to hire Plaintiffs as personal service contractors.

49.    Section 636(a)(3) of the FAA requires that Plaintiffs be regarded as employees of the United States Government for all purposes but "any law administered by the Civil Service Commission."

50.     Plaintiffs' contracts also stated that "[a]s an employee for purposes of Section 636(a)(3) of the Foreign Assistance Act of 1961, as amended (22 USC 2396(a)(3)), the Contractor is generally an employee of the United States for purposes of laws other than those administered by the Office of Personnel Management (i.e., Title 5, United States Code)." *See also* 25 U.S.C. § 2151aa(d)(3)(A).[1]

51.     Plaintiffs maintained an employer-employee relationship with USAID.

52.     Plaintiffs performed inherently governmental functions that included supervising other staff.

53.     USAID issued the Plaintiffs Form W-2 wage and tax statements.

54.     USAID treated each Plaintiff as "an employee of the United States," for the purposes of Title 26, the Internal Revenue Code, including Section 911 (foreign earned income tax exclusion) and 912 (income tax exclusion of allowances of Government employees).

55.     USAID treated each Plaintiff as an employee who acts directly in the interest of the United States for the purposes of Title 29, the Family and Medical Leave Act of 1993, as amended ("FMLA").

56.     Like direct-hire and appointed federal employees, USAID issued Plaintiffs diplomatic passports.

57.     USAID provided Plaintiffs with sick and annual leave.

58.     As PSCs, Plaintiffs were treated as federal employees for the purposes of the Federal Workers' Compensation Act. 5 U.S.C. § 8101 *et seq*.

---

[1] The attached exhibit serves as a reference for the Court for the contractual rights that Plaintiffs allege appear in all of the named plaintiffs' contracts. Upon the Court's order, Plaintiffs will provide the Court or the United States with copies of all underlying contracts.

59. As PSCs, Plaintiffs could receive GS scale step increases as part of their annual performance review on par with direct hires.

60. As PSCs, Plaintiffs received locality pay and the same percentage comparability adjustments as direct hires.

61. As PSCs, Plaintiffs were eligible for allowances that direct hires are eligible for, including living quarters, supplemental post, separate maintenance education, and educational travel allowances.

62. As PSCs, Plaintiffs were ordered to submit Form 306-Declaration for Federal Employment, which the Office of Personnel Management (OPM) demands pursuant to its Title 5 authority over civil service employees. OPM, Declaration for Federal Employment, https://www.opm.gov/forms/pdf_fill/of0306.PDF (on file with United States Government) (last visited Oct. 1, 2025).

63. USAID subjected Plaintiffs to a slew of Title 5 and non-Title 5 restrictions that apply to civil service employees.

64. As PSCs, USAID subjected Plaintiffs to the same post-employment restrictions as direct-hire federal employees for the purposes of the lifetime ban on making a communication or appearance involving particular matters that they personally or substantially worked on or had direct or substantial interest in. 18 U.S.C. § 207(a)(1).

65. As PSCs, USAID subjected Plaintiffs to the same post-employment restrictions as federal employees for the purposes of the two-year restriction on particular matters involving parties for whom the matter was pending under Plaintiffs' official responsibility. 18 U.S.C. § 207(a)(2).

66.    As PSCs, USAID subjected Plaintiff to all the other requirements of the Ethics in Government Act of 1978, 18 U.S.C. § 207, and all the Office of Personnel Management's implementing regulations, 5 CFR part 737.

67.    As PSCs, USAID subjected Plaintiffs to the same payment and gift restrictions as direct-hire federal employees under both Title 5 and Title 18. *See* 5 U.S.C. § 7324 (prohibiting receipt and disposition of foreign gifts and decorations); 18 U.S.C. §§ 201, 209 (Bribery of public officials and witnesses and Salary of Government officials and employees payable only by the United States).

68.    As PSCs, USAID treated Plaintiffs as federal employees for the purposes of restrictions on engaging in certain political activities under Title 5 pursuant to the Hatch Act. 5 U.S.C. §§ 1501–1508.

69.    After a change in the presidential administration in January of 2025, officials in the current administration publicly attacked the political affiliations of USAID employees.

**B.    *The Termination of Plaintiffs' Employment***

70.    On February 2, 2025, President Trump responded to a question about changes at USAID by stating: "It's been run by a bunch of radical lunatics, and we're getting them out, and then we'll make a decision." *President Trump Speaks to Reporters Upon Return from Mar-a-Lago*, C-SPAN (Feb. 2, 2025), https://www.c-span.org/program/public-affairs-event/president-trump-speaks-to-reporters-upon-return-from-mar-a-lago/655273 (on file with C-SPAN) (last visited Oct. 1, 2025).

71.    Elon Musk, then serving as the head of the Department of Government Efficiency ("DOGE"), stated that shutting down USAID was justified because the workers were "incredibly politically partisan" and their work has supported "radically left causes throughout the world

12

including things that are anti-American." Jennifer Hansler *et al.*, *Elon Musk said Donald Trump agreed USAID needs to be 'shut down'*, CNN (Feb. 3, 2025), https://www.cnn.com/2025/02/02/politics/usaid-officials-leave-musk-doge (on file with CNN) (last visited Oct. 1, 2025).

72.    Elon Musk also stated that "USAID is a criminal organization" and that it was "[t]ime for it to die." Elon Musk (@elonmusk), X (Feb. 2, 2025, 12:20 PM), https://x.com/elonmusk/status/1886102414194835755?lang=en (on file with X) (last visited Oct. 1, 2025).

73.    On February 3, 2025, Musk stated that he has been working to feed USAID "into the wood chipper." Elon Musk (@elonmusk), X (Feb. 3, 2025, 1:54 AM), https://x.com/elonmusk/status/1886307316804263979?s=46 (on file with X) (last visited Oct. 1, 2025).

74.    On February 5, 2025, White House deputy chief of staff for policy, Stephen Miller, stated that upcoming USAID cuts were meant to address the political make-up of the Agency.

75.    Stephen Miller stated: "I want to really drill down on this…because it's so important, there's two million employees in the federal government. Overwhelmingly, the career federal service in this country is far left, left-wing." *Jake Tapper left stunned as Stephen Miller explains why Trump ordered a surprise freeze on federal spending*, DailyMail (Jan. 29, 2025), https://www.dailymail.co.uk/media/article-14336461/Jake-Tapper-Stephen-Miller-trump-freeze-fed-spending.html (on file with DailyMail) (last visited Oct. 1, 2025).

*76.*    Focusing specifically on USAID employees, Stephen Miller added: "We looked at USAID as an example, 98 percent either donated to Kamala Harris or another left-wing candidate." *USAID has been 'exposed' as the funding mechanism for the radical left, says Stephen Miller*, Fox

News (Feb. 5, 2025), https://www.foxnews.com/video/6368342845112 (on file with Fox News) (last visited Oct. 1, 2025).

77.     Peter Marocco who was selected to serve as the Deputy Administrator of USAID, also justified the reorganization of workforce in political terms.

78.     In 2023, Peter Marocco described USAID employees' responsibilities as working on "Democrat" or "liberal word soup" programs. *Pete Marocco tried to upend USAID in 2020 — and failed. In 2025, he dismantled it*, NPR (Mar. 25, 2025), https://www.npr.org/sections/goats-and-soda/2025/03/25/g-s1-50582/usaid-pete-marocco-trump-foreign-aid (on file with NPR) (last visited Oct. 1, 2025).

79.     During his previous stint at USAID, Mr. Marocco served as the Bureau of Conflict Prevention and Stabilization Assistant to the Administrator.

80.     In 2020, a 13-page complaint by USAID staffers informed USAID leadership at the time that Mr. Marocco's "interventions in the PSC contracting process," was raising "potential legal liabilities." *See Dissent Channel Memo on OTI's Degrading Capacity, Reduced Strategic Impact, and Wasted Resources* (Sept. 17, 2020).

81.     The USAID staffers' letter detailed that Mr. Marocco had specifically questioned "renewing the contracts of individual PSCs working on programs whose goals he does not support, even though the individuals have highly favorable performance reviews and the programs are widely supported within the interagency." *Id*. at 4.

82.     The USAID staffers' complaint letter stated that in at least three cases, Mr. Marocco had asked to speak individually with PSCs before approving a renewal of their contract.

83.    Upon information and belief, during his second stint at USAID in the spring of 2025, Mr. Marocco routinely berated USAID staff in person and expressed his belief that he hated working with the USAID staff whom he believed did not deserve anything.

84.    President Trump also appointed Tim Meisburger as the head of BHA in January of 2025.

85.    In August of 2023, Meisburger published an article titled "Political Discrimination Threatens U.S. Foreign Assistance." Tim Meisburger, Political Discrimination Threatens U.S. Foreign Assistance, Heritage Found. (Aug 15, 2023), *https://www.heritage.org/global-politics/report/political-discrimination-threatens-us-foreign-assistance* (on file with Heritage Found.) (last visited Oct. 1, 2025).

86.    Meisburger's work and the associated article included researching the political affiliation of USAID employees and traced the need for reforming USAID with USAID's employees' political ideology.

87.    The article claimed that "well over 90 percent (and sometimes 100 percent) of [USAID] employee contributions went only to Democratic candidates and causes," and advocated for eliminating "USAID's political bias."

88.    Contemporaneous with these public statements explaining that USAID needed to be downsized to control what these officials viewed as left-leaning ideology, USAID terminated the Plaintiffs' contract in February of 2025.

89.    By February 7, 2025, USAID terminated approximately 791 PSCs, and terminations continued throughout that month.

90.    Upon information and belief, while USAID continues to conduct program and employee termination through a formal review process, the first round of immediate terminations,

which included Plaintiffs, were not preceded by a formal review because the underlying work was immediately perceived as being politically out of alignment.

C.      *Events Since Termination of Plaintiffs' Employment*

91.     On March 28, 2025, the Department of State also announced that USAID's foreign assistance programs will be curtailed and moved to the Department of State. Dept. of State, On Delivering an America First Foreign Assistance Program (Mar. 28, 2025), https://www.state.gov/on-delivering-an-america-first-foreign-assistance-program/ (on file with United States Government) (last visited Oct. 1, 2025).

92.     On that day, USAID employees received a notice from Jeremy Lewin, Deputy Administrator & Chief Operating Officer, titled "USAID's Transition to the State Department."

93.     That notice stated that the Department of State "will seek to retire USAID's independent operation," and that the Department will assume responsibility for whatever USAID program that is not terminated in full. *Id.*

94.     The notice of upcoming reduction in force did not reassign USAID employees and instead stated that the Department of State will conduct its own "independent hiring process," which will only "be available for eligible USAID employees." *Id*.

95.     Upon information and belief, a selective group of more than 300 USAID employees, including a number of PSCs, have been offered positions within the Department of State.

96.     Neither the Department of State nor USAID has disclosed the transfer and hiring process for these transitioning employees to establish compliance with the competitive hiring process.

97.    Upon information and belief, after terminating personal service contractors under the guise that their work was no longer needed, the Department now seeks to rehire them to carry out the same work at the Department of State.

98.    On May 29, 2025, OPM issued a memorandum on "Merit Hiring Plan" to all departments and agencies. OPM, Merit Hiring Plan (May 29, 2025), *available at* https://www.opm.gov/policy-data-oversight/latest-memos/merit-hiring-plan/ (on file with United States Government) (last visited Oct. 1, 2025).

99.    The Merit Hiring Plan memorandum requires agencies to consider applicants' answers to four essay questions in making hiring decisions.

100.    These essay questions test the applicants' political allegiance to the President's political party by compelling responses that emphasize the applicants' personal affection for the current administration's policies, as opposed to the applicable agency's statutory mandated mission statement.

101.    The memorandum does not specify any standards for determining positions where effective performance may rely on political loyalty or affiliation and instead requires that questions apply to any applicant for a federal job announcement "graded at GS-05 or above."

102.    The questions serve as a blanket political loyalty test regardless of the position.

103.    Public statements by deciding officials that describe USAID cuts in terms of political affiliation have also continued even after the termination of Plaintiffs' employment.

104.    In justifying USAID cuts, on June 25, 2025, Russell Vought, the director of the Office of Management and Budget, stated: "Most Americans would be shocked and appalled to learn that their tax dollars, money they thought were going to medical care, was actually going to far-left activism, population control and sex workers." *OMB Director on Recissions*, C-SPAN

(Jun. 25, 2025), https://www.c-span.org/clip/senate-committee/omb-director-on-recissions/5166473 (on file with C-SPAN) (last visited Oct. 1, 2025).

105. On January 30th, 2025, President Trump appointed Secretary of State, Marco Rubio, as the Acting Administrator of USAID.

106. In an interview on April 8, 2025, Secretary Rubio stated that the USAID contracts that were terminated were ones that promoted the "domestic policies of the far left" and amounted to "cultural imperialism." *Secretary of State Marco Rubio with Donald Trump, Jr. of Triggered with Don Jr.,* U.S. Dep't of State (Apr. 8, 2025), https://www.state.gov/secretary-of-state-marco-rubio-with-donald-trump-jr-of-triggered-with-don-jr/ (on file with United States Government) (last visited Oct. 1, 2025).

107. USAID terminated the contracts by relying on the government's authority to terminate contracts for convenience.

108. Plaintiffs suffered harm as a result of the termination, including, but not limited to, losing the direct and immediate value of their annualized salary and all related benefits for the remainder of the contract and the option years associated with each contract.

109. Plaintiffs also suffered compensatory and consequential harm as the foreseeable result of the sudden unlawful termination, including but not limited to, pecuniary out-of-pocket cost of seeking reemployment and relocation, and non-pecuniary costs, including physical and emotional suffering and damage to personal and professional reputation.

110. The Government takes the position that Plaintiffs only have one recourse: channeling any dispute about the termination through the contracting officer under the Contract Dispute Act of 1978, 41 U.S.C. § 7101 *et seq.*, and that their entitlement is limited to those damages provided under the Federal Acquisition Regulation (FAR).

18

111.    The United States identifies the Plaintiffs as federal employees in their contracts, and, indeed, is required by law to identify them and treat them as federal employees under Section 636(a)(3) of the FAA and other program-specific legislations that authorize hiring of USAID PSCs.

112.    Because the United States is required by both law and the text of the contract to identify and treat the Plaintiffs as federal employees, the Plaintiffs cannot be subjected to the terms of the CDA and its applicable regulations which solely apply to contractors and cover performance by parties other than federal employees.

## COUNT ONE
**(Violation of First Amendment Right against Political Patronage Termination)**

113.    Plaintiffs incorporate all proceeding paragraphs.

114.    The First Amendment to the United States protects against retaliation based on political affiliation.

115.    That protection extends to public employees, and as such, dismissing public employees based on political affiliation or beliefs violates the First Amendment.

116.    That protection extends to public employees, and as such, conditioning future public employment on political affiliation violates the First Amendment. *See e.g.*, *Keyishian v Board of Regents of the University of the State of New York*, 385 US 589, 604 (1967) (holding that a state-mandated loyalty oath in faculty contracts violates the First Amendment).

117.    USAID dismissed the employees because of their political affiliation and because they could only be trusted to carry out one political party's administrative mission.

118.    Plaintiffs face the risk of having to establish their political loyalty to the current administration before being able to be rehired.

19

119. Plaintiffs have suffered irreparable injury and monetary harm as a result of the United States' violation of this First Amendment right, and this harm will continue unless and until enjoined by appropriate order of this Court.

120. When the United States violates the First Amendment by removing federal employees who the United States claims are not covered by the Civil Service Reform Act's remedial scheme, the First Amendment provides the right to reinstatement, backpay, compensatory, and other relief.

## COUNT TWO
### (Breach of Contract)

121. Plaintiffs incorporate all proceeding paragraphs.

122. The Plaintiffs signed a valid contract with the United States.

123. The United States had obligations and duties arising out of the contract.

124. The text of the contract and the underlying statutory grant of authority imposed on the United States the obligation to refrain from treating the Plaintiffs as employees for the purposes of any laws administered by OPM.

125. The United States breached this obligation by treating the Plaintiffs as employees for the purposes of laws that are administered by OPM.

126. The text of the contract and the underlying statutory grant of authority imposed on the United States the obligation to treat Plaintiffs as federal employees for all other purposes other than laws administered by OPM.

127. The United States breached this obligation by failing to treat Plaintiffs as federal employees who cannot be subjected to CDA.

128. The United States had the obligation to refrain from terminating the contract in a manner that violates the Plaintiffs' rights, including their First Amendment Rights.

129.    The United States breached these obligations and duties.

130.    The United States' breach of the contract caused Plaintiffs irreparable harm and monetary damages.

## COUNT THREE
### (Breach of Contract Based on Breach of the Covenant of Good Faith and Fair Dealing)

131.    Plaintiffs incorporate all proceeding paragraphs.

132.    Plaintiffs' contracts contained an implied covenant of good faith and fair dealing.

133.    The United States breaches the implied covenant of good faith and fair dealing when it violates its obligations under the Constitution.

134.    The United States breached the implied covenant of good faith and fair dealing by violating the Plaintiffs' First Amendment rights against political reprisal.

135.    The United States breaches the implied covenant of good faith and fair dealing when it interferes with and fails to cooperate in Plaintiffs' performance of their contract. Restatement (Second) of Contracts § 205 cmt. d. (1981).

136.    The United States interfered with and failed to cooperate with Plaintiffs' performance of their contract because the United States had the chance to direct and supervise Plaintiffs' work to bring them in alignment with the current administrations' missions instead of terminating them, but the United States chose not to do so and instead terminate the contract for pretextual reasons.

137.    Based on these breaches of the implied covenant of good faith and fair dealing the Government is liable to the Plaintiffs.

## COUNT FOUR
### (Violation of Administrative Procedure Act, 5 U.S.C. §706(2)(A), (B), and (C), Contrary to Law and Constitution)

138.    Plaintiffs incorporate all proceeding paragraphs.

21

139. The Court applies the APA standard of review when the record of the administrative process needs to be reviewed to determine whether the United States violated government employees' pay entitlements, *see Keltner v. United States*, 165 Fed. Cl. 484 (2023), or when the administrative record could establish that contractual termination was pretextual or unrelated to the contractors' alleged inability to fulfill their obligations. *McDonnell Douglas Corp. v. United States*, 182 F.3d 1319 (1999); *see also Department of Education v. California*, 145 S. Ct. 996 (Apr. 4, 2025) (finding that APA claims seeking recovery of contractual money damages should proceed at the Court of Federal Claims).

140. USAID is a federal agency within the meaning of the APA. 5 U.S.C. § 551(1).

141. Under the APA, a court shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

142. Under the APA, a court shall "hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

143. Under the APA, a court shall "hold unlawful and set aside agency action" that is in "excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

144. The decision to terminate Plaintiffs' contracts en masse is a final agency action subject to APA review because it "mark[s] the consummation of the agency's decision making process," and it impacts "rights or obligations...from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

145.    The termination decision was arbitrary and capricious under 706(2)(A) because it was pretextual and detached from contract performance. *See John A. Johnson Contracting Corp. v. United States*, 132 F. Supp. 698 (Ct. Cl. 1955).

146.    The termination decision was "contrary to constitutional right, power, privilege, or immunity" under 5 U.S.C. § 706(2)(B) because it violated the Plaintiffs' First Amendment rights.

147.    The termination decision was in "excess of statutory jurisdiction, authority, or limitations, or short of statutory right" under 5 U.S.C. § 706(2)(C) because it violated the Plaintiffs' statutory right to be treated as federal employees for all purposes other than the laws administered by OPM under the applicable FAA's section authorizing the contract.

148.    The terminations must be set aside under the APA as arbitrary and capricious and unlawful.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court grant relief against Defendant as follows:

(a)    Find that because the United States identifies the Plaintiffs as federal employees, the Plaintiffs cannot be subjected to the Contract Dispute Act;

(b)    Enter an order enjoining Defendant from continuing its unlawful practice of subjecting PSCs to the Contract Dispute Act while identifying them and treating them as federal employees;

(c)    Enter an order enjoining Defendant from taking any personnel action to enforce OPM guidance or any other policy that seeks to evaluate the political affiliation of future applicants for Plaintiffs' positions;

23

(d)      Enter an order enjoining Defendant from rehiring for Plaintiffs' positions without first notifying the Court and giving Plaintiffs' the chance to be restored to their previous official positions;

(e)      Provide leave to add additional Plaintiffs by motion or any other method approved by the Court; and

(f)      Awarding Plaintiffs the wages and associated benefits they are owed under their contracts, compensatory and consequential damages as a result of unlawful termination, reasonable attorney fees, and any other relief as the Court deems just and proper in an amount to be proven at trial.

## **JURY DEMAND**

Plaintiffs demand a trial by jury for all issues so triable.

Dated: October 3, 2025                          Respectfully submitted,

/s/ *Thomas M. Craig*
Thomas M. Craig, Esq.
**Fluet**
1751 Pinnacle Drive, Suite 1000, Tysons, VA 22102
T : (703) 590-1234 | F : (703) 590-0366
tcraig@fluet.law
e-file@fluet.law
*Counsel for Plaintiffs*

*Of Counsel:*

Kiarash Rahnama Moghaddam, Esq.
**Fluet**
1751 Pinnacle Drive, Suite 1000,
Tysons, VA 22102
T : (703) 590-1234 | F : (703) 590-0366
krahnama@fluet.law
e-file@fluet.law
*Counsel for Plaintiffs*

24

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 3, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Federal Claims by using the CM/ECF system. I also certify that the foregoing document is being served on Defendant's counsel of record and that service will be accomplished by the CM/ECF system.

<div align="center" style="margin-left:45%;">

*/s/ Thomas M. Craig*
Thomas M. Craig, Esq.

</div>